CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 18 2017

JULIA DUDLEY, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

MARK T. GRANT,                        )
                                      )
        Plaintiff,                    )       Civil Action No. 7:16CV00007
                                      )
v.                                    )       **MEMORANDUM OPINION**
                                      )
CITY OF ROANOKE,                      )       Hon. Glen E. Conrad
                                      )       United States District Judge
        Defendant.                    )

Mark T. Grant, proceeding pro se, filed this action against the City of Roanoke (the "City"), alleging that the City improperly retained $26,257.30 from the sale of certain real property, which was previously rehabilitated for occupancy, using funds made available to the City through the federal HOME Investment Partnerships Program ("HOME Program"). Grant claims that the City violated regulations implementing the HOME Investment Partnerships Act and his constitutional right to due process, and that he is entitled to relief under 42 U.S.C. § 1983. The case is presently before the court on the City's motions for summary judgment. For the reasons that follow, the motions will be granted in part and denied in part.

**Statutory and Regulatory Background**

Before delving into the factual background of this dispute, the court will summarize the statutory and regulatory context in which the facts developed.

The HOME Program is a federal block grant program created pursuant to the Cranston-Gonzalez National Affordable Housing Act of 1990 ("NAHA"), as amended, 42 U.S.C. § 12701 et seq. One of the stated purposes of the NAHA is "to extend and strengthen partnerships among all levels of government and the private sector, including for-profit and nonprofit

organizations, in the production and operation of housing affordable to low-income and moderate-income families." Id. § 12703(3).

Subtitle A of Title II of the NAHA, also known as the HOME Investment Partnerships Act ("HOME Act"), authorizes the Secretary of the United States Department of Housing and Urban Development ("HUD") "to make funds available to participating jurisdictions for investment to increase the number of families served with decent, safe, sanitary, and affordable housing and expand the long-term supply of affordable housing in accordance with provisions of this part." Id. § 12741. The HOME Act directs the Secretary to establish by regulation certain procedures with which states and municipalities must comply in order to be designated as participating jurisdictions and receive their own allocations of HOME funds. See id. § 12746. The Secretary is further directed to establish a HOME Investment Trust Fund for each participating jurisdiction, along with a line of credit that includes the participating jurisdiction's allocated HOME funds. See id. § 12748.

The HOME Act invokes Congress's authority under the Spending Clause to place conditions on the receipt of federal funds allocated by the Secretary.[1] Section 212 of the HOME Act, titled "Eligible uses of investment," describes the types of activities for which HOME funds may be used by participating jurisdictions, each of which relates to increasing the supply of affordable housing.[2] See id. § 12742(a)-(c). The statute provides in relevant part as follows:

---

[1] The Spending Clause of the Constitution of the United States empowers Congress "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const., art. I, § 8, cl. 1. "The Clause provides Congress broad discretion to tax and spend for the 'general Welfare,' including by funding particular state or private programs or activities." Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. ___, ___, 133 S. Ct. 2321, 2327-28 (2013). Incident to this power, Congress may "impose limits on the use of such funds to ensure they are used in the manner Congress intends." Id. at ___, 133 S. Ct. at 2328.

[2] Section 212 also lists a number of activities for which the use of HOME funds is expressly prohibited, none of which are at issue in this action. See 42 U.S.C. § 12742(d).

2

> Funds made available under this part may be used by participating jurisdictions to provide incentives to develop and support affordable rental housing and homeownership affordability through the acquisition, new construction, reconstruction, or moderate or substantial rehabilitation of affordable housing, including real property acquisition, site improvement, conversion, demolition, and other expenses, including financing costs, relocation expenses of any displaced persons, families, businesses, or organizations, to provide for the payment of reasonable administrative and planning costs, to provide for the payment of operating expenses of community housing development organizations, and to provide tenant-based rental assistance.

Id. § 12742(a)(1). The statute further provides that a participating jurisdiction "shall give preference to rehabilitation of substandard housing," unless it determines that "such rehabilitation is not the most cost effective way to meet the jurisdiction's need to expand the supply of affordable housing" and "the jurisdiction's housing needs cannot be met through rehabilitation of the available stock." Id. § 12742(a)(2).

The HOME Act requires participating jurisdictions to match a certain percentage of the HOME funds that they spend in a fiscal year with their own contributions to housing that qualifies as affordable housing under the Act. See id. § 12750(a). The Act further provides that "[e]ach participating jurisdiction shall make all reasonable efforts . . . to maximize participation by the private sector, including nonprofit organizations and for-profit entities, in the implementation of the jurisdiction's housing strategy, including participation in the financing, development, rehabilitation and management of affordable housing." Id. § 12751.

Section 215 of the HOME Act establishes specific requirements that housing for homeownership must meet in order to qualify as "affordable housing" for purposes of the Act. See id. § 12745(b). The statutory requirements are as follows:

3

Housing that is for homeownership shall qualify as affordable housing under this subchapter only if the housing—

(1) has an initial purchase price that does not exceed 95 percent of the median purchase price for the area, as determined by the Secretary with such adjustments for differences in structure, including whether the housing is single-family or multifamily, and for new and old housing as the Secretary determines to be appropriate;

(2) is the principal residence of an owner whose family qualifies as a low-income family—

(A) in the case of a contract to purchase existing housing, at the time of purchase;

(B) in the case of a lease-purchase agreement for existing housing or for housing to be constructed, at the time the agreement is signed; or

(C) in the case of a contract to purchase housing to be constructed, at the time the contract is signed;

(3) is subject to resale restrictions that are established by the participating jurisdiction and determined by the Secretary to be appropriate to—

(A) allow for subsequent purchase of the property only by persons who meet the qualifications specified under paragraph (2), at a price which will—

(i) provide the owner with a fair return on investment, including any improvements, and

(ii) ensure that the housing will remain affordable to a reasonable range of low-income homebuyers; or

(B) recapture the investment provided under this subchapter in order to assist other persons in accordance with the requirements of this subchapter, except where there are no net proceeds or where the net proceeds are insufficient to repay the full amount of the assistance; and

(4) if newly constructed, meets the energy efficiency standards promulgated by the Secretary in accordance with section 12709 of this title.

Id.

If a participating jurisdiction is found to have "failed to comply substantially with any provision" of the HOME Act, the Secretary of HUD is directed to take certain corrective measures. See id. § 12753. Specifically, the Secretary "shall reduce the line of credit in the participating jurisdiction's HOME Investment Trust Fund by the amount of any expenditures that were not in

accordance with the requirements of [the Act]." Id.   The Secretary may also prevent withdrawals from the participating jurisdiction's HOME Investment Trust Fund, restrict the participating jurisdiction's activities under the HOME Act, or preclude the participating jurisdiction from receiving allocations of funds made available under the Act.   Id.

HUD has promulgated regulations implementing the HOME Program.   See 24 C.F.R. § 92.254.   Pursuant to the regulations, housing that is for acquisition by a family must meet certain "affordability requirements."   Id. § 92.254(a).   In particular, the housing must be single-family, modest housing; it must be acquired by a low-income family and used as the family's principal residence; and it must meet the affordability requirements for a specific period as determined by the amount of assistance provided.   See id. § 92.254(a)(1)-(4).   For example, HOME assistance over the amount of $40,000 triggers a minimum affordability period of fifteen years.   See id. § 92.254(a)(4).

Additionally, to ensure affordability, a participating jurisdiction is required to establish either "resale" or "recapture" requirements that comply with the regulatory standards established by HUD.   Id. § 92.254(a)(5).   The resale or recapture requirements must be included in the consolidated plan that the participating jurisdiction submits to HUD for approval, and HUD must determine that they are appropriate.   Id.   During the relevant time period, the regulation included the following provisions applicable to resale and recapture requirements:

> (i) *Resale.*   Resale requirements must ensure, if the housing does not continue to be principal residence of the family for the duration of the period of affordability, that the housing is made available for subsequent purchase only to a buyer whose family qualifies as a low-income family and will use the property as its principal residence.   The resale requirements must also ensure that the price at resale provides the original HOME-assisted owner a fair return on investment (including the homeowner's investment and any capital improvement) and ensure that the housing will remain affordable to a reasonable range of low-income homebuyers.   The

period of affordability is based on the total amount of HOME funds invested in the housing.

(A) Except as provided . . . , deed restrictions, covenants running with the land, or other similar mechanisms must be used as the mechanism to impose the resale requirements. . . .

(ii) *Recapture.* Recapture provisions must ensure that the participating jurisdiction recoups all or a portion of the HOME assistance to the homebuyers, if the housing does not continue to be the principal residence of the family for the duration of the period of affordability.

(A) The following options for recapture requirements are acceptable to HUD. . . .

(3) *Shared net proceeds.* If the net proceeds are not sufficient to recapture the full HOME investment . . . plus enable the homeowner to recover the amount of the homeowner's downpayment and any capital improvement investment made by the owner since purchase, the participating jurisdiction may share the net proceeds. The net proceeds are the sales price minus loan repayment (other than HOME funds) and closing costs. The net proceeds may be divided proportionally as set forth in the following mathematical formulas:

$$\frac{\text{HOME investment}}{\text{HOME investment} + \text{homeowner investment}} \times \text{Net proceeds} = \text{HOME amount to be recaptured}$$

$$\frac{\text{homeowner investment}}{\text{HOME investment} + \text{homeowner investment}} \times \text{Net proceeds} = \text{amount to homeowner}$$

Id. § 92.254(a)(5)(i)-(ii) (2005).

The HOME Act's implementing regulations also provide for performance reviews and sanctions by HUD. See 24 C.F.R. §§ 92.550-92.552. Pursuant to § 92.550, HUD must review the performance of each participating jurisdiction in carrying out its statutory and regulatory responsibilities "whenever determined necessary by HUD, but at least annually." Id. § 92-550(a). In conducting performance reviews, HUD may consider relevant information gained from a number of sources, including citizen comments and complaints. Id. Section 92.551 sets forth the procedures HUD must use in conducting performance reviews and in taking corrective and

6

remedial actions.    The regulation provides that "[c]orrective or remedial actions for a performance deficiency (failure to meet a provision of this part) will be designed to prevent a continuation of the deficiency; mitigate, to the extent possible, its adverse effects or consequences; and prevent its recurrence." Id. § 92.551(c).  The types of corrective and remedial actions that HUD may take against participating jurisdictions are set forth in sections 92.551 and 92.552. They include requiring a participating jurisdiction to "[r]eimburs[e] its HOME Investment Trust Fund in any amount not used in accordance with the requirements of this part." Id. § 92.551(c).

### Factual Background and Procedural History

The City has administered and implemented its HOME Investment Partnership Program since 1994.  Aff. of Crystal H. Hypes ("Hypes Aff.") ¶ 4, Docket No. 16-1 at 1.  In or around 2000, "the City was awarded certain HOME funds . . . by HUD for the purpose of . . . partner[ing] with a private entity . . . [to] mak[e] affordable housing available to low income families." Id. ¶ 5. The City ultimately partnered with Blue Ridge Housing Development Corporation ("BRHDC"), a nonprofit housing agency.[3]  Id. ¶ 6.  By agreement dated July 1, 2002, the City made available to BRHDC certain HOME funds to develop and rehabilitate housing for sale to low income purchasers meeting HUD's low-income criteria.  Id.  As is relevant in the instant case, BRHDC received $101,119.05 to purchase and rehabilitate certain real property located at 607 Bullitt Avenue in Roanoke, Virginia ("the Property").  Id. ¶ 8.

The plaintiff and his wife, Lori M. Grant, were found to qualify for the City's HOME Program.  Id. ¶ 9.  On May 20, 2005, they purchased the Property from BRHDC for the price of $85,000.00, plus additional closing costs totaling $3,969.20.  See HUD-1 Settlement Statement,

---

[3] BRHDC ceased operations sometime prior to 2013.  See Hypes Aff. ¶ 7.

Docket No. 16-1 at 7.   The funds used to purchase the Property were derived from the following sources: (1) an $80,000.00 loan, secured by a first deed of trust on the Property, from a private bank; (2) a $2,200.00 HOME grant, secured by a second deed of trust on the property, from the Virginia Department of Housing and Community Development ("VDHCD"); (3) a Community Development Block ("CDBG") grant in the amount of $6,400.00; and (4) $100.00 in cash, paid out-of-pocket by the buyers.   See id.; see also Hypes Aff. ¶ 10.

Pursuant to the statutory and regulatory scheme discussed above, the City was required to ensure the affordability of the Property for a period of fifteen years.   See Hypes Aff. ¶ 17.   It was also required to impose resale or recapture requirements on the Property.   See id. ¶ 12.   Because BRHDC received the HOME assistance to improve the Property and the plaintiff and Ms. Grant did not directly obtain any HOME funds from the City, the City utilized the resale option.   See Id. ¶ 15.

The resale requirements were imposed on the Property pursuant to a Declaration of Restrictive Covenants, dated April 29, 2005, which was signed by the City, BHRDC, the plaintiff, and Ms. Grant.   See Declaration of Restrictive Covenants ("Restrictive Covenants"), Docket No. 16-4 at 1.   The Restrictive Covenants contained terms and conditions that applied against the Property for a period of fifteen years, based on the amount of HOME funds invested in the Property.   The Restrictive Covenants provided that, within the fifteen-year affordability period, "any sale or conveyance of the Property shall be only to a family having a gross family income not exceeding 80% of the area median, as established by HUD at the time of the transfer of the Property, and which shall use the Property as its principal residence."   Id.   The Restrictive Covenants further provided that "[a]ny such sale or conveyance of the Property shall allow the owner a fair return on investment," which was defined as follows:

8

By this is meant that the owner, after satisfying any outstanding loans on the Property (including loans made with HOME funds), may recover the amount of the owner's down payment and closing costs and any capital improvement investment. Thereafter, the City and the homeowner shall share any remaining (net) proceeds from the sale or conveyance. The remaining proceeds shall be divided proportionally as set forth in the following mathematical formulas:

$$\frac{\text{HOME investment}}{\text{HOME investment} + \text{homeowner investment}} \times \text{Net proceeds} = \text{Amount to City}$$

$$\frac{\text{homeowner investment}}{\text{HOME investment} + \text{homeowner investment}} \times \text{Net proceeds} = \text{Amount to homeowner}$$

Id.

The plaintiff informed the City in late 2013 that he would be selling the Property prior to the end of the fifteen-year affordability period, and he inquired about the existence of the Restrictive Covenants. See Hypes Aff. ¶ 19. The City informed the plaintiff that the proposed sale would be subject to the terms of the Restrictive Covenants and that any remaining proceeds from the sale would be shared between the City and the plaintiff pursuant to the resale formula set forth therein. Id.

In January of 2014, the plaintiff and Ms. Grant sold the Property to Devin Brown for the amount of $106,000.00. Id. ¶ 20. This sale triggered the resale provisions of the Restrictive Covenants. "The sales proceeds were first applied to the outstanding loans against the Property, repayment of [p]laintiff's initial down payment, believed at the time to be $669.20 [rather than $100.00], and closing costs, leaving remaining net sales proceeds in the amount of $26,430.95." Id. Application of the resale formula in the Restrictive Covenants resulted in the City receiving $26,257.30, and the plaintiff and Ms. Grant receiving an additional $173.65. Id. ¶ 21.

9

The plaintiff and Ms. Grant disputed the manner in which the remaining sales proceeds were divided and ultimately complained to HUD. Id. ¶ 22. On July 15, 2014, HUD sent the City a letter in response to the Grants' complaint. Id. According to the letter, the "Grant[s'] complaint asserted that they did not receive a fair return of their investment pursuant to the sale of their property." Letter from HUD ("HUD Letter") 1, July 15, 2014, Docket No. 19-1. Upon review of the matter, HUD "determined that the city's resale policy for Mark T. and Lori M. Grant's purchase and subsequent resale of 607 Bullitt Avenue was not in compliance with the HOME regulations in effect in 2005." Id. at 2. The letter included the specific "finding" that "[t]he city's HOME resale policy was not in compliance with the regulation at 24 CFR [§] 92.254," since the policy "did not define and provide a fair return of the homeowner's initial investment and any capital improvements" and "relied on the recapture formula as its resale formula." Id. HUD explained that the recapture formula was "unique to the recapture option" and that "[t]he resale requirements require a different methodology." Id. HUD also indicated that the City had "improperly recaptured the state's downpayment assistance of $2,200." Id. HUD explained that the $2,200 in HOME funds provided by the state should have been "considered to be a portion of the [Grants'] investment because the corresponding period of affordability had been satisfied." Id. HUD ultimately concluded that the "effect" of the problem was that "the Grant[s] did not receive a fair return on their investment pursuant to a regulatory compliant resale policy" and "were not given consideration for the $2,200 in HOME funds provided by the state of Virginia." Id. at 3.

In the letter, HUD proposed the following corrective actions:

> Within 45 days from the date of this letter the city must retroactively adopt a revised resale policy that determines the original homebuyer's fair return on investment based on an objective standard or index that is publicly accessible and can be easily

10

measured at the time of original purchase and at resale. The resale policy must also outline how it will value capital improvements, and include a comprehensive description of what will constitute a capital improvement for purposes of determining [a] fair return. The value of a capital improvement cannot be based on an appraisal. The resale provisions must be recorded and the provisions must be in the HOME agreement. The policy must outline how the city will control and determine the sale price for subsequent buyers.

The proposed policy must be submitted to this office for review and final approval. Once approved, this policy will be applied to all homebuyer cases under the old policy upon resale unless the controlling period of affordability has expired.

The city must also recalculate the Grant[s'] resale transaction and in so doing the city must take into consideration the $100 earnest money and the $2,200 of HOME funds provided by the state of Virginia. The city must also give consideration for any capital improvements that were made. Once this has been accomplished the city must give credit for the $669.20 that was returned to the Grant[s] in order to determine the revised return on investment. The resultant calculation must also be submitted to this office for review and approval.

Id. at 3-4. The letter noted that "[t]hese corrective and remedial actions are consistent with 24 C.F.R. [§] 92.551 and are intended to prevent a continuation of the deficiency and to mitigate, to the extent possible, the adverse impact to the involved homebuyers." Id. at 4.

In an effort to resolve the matter, the City advised HUD that it would be willing to consider the $2,200.00 HOME grant from the state, along with the $100.00 paid out-of-pocket by the Grants at the time of closing, as the Grants' homeowner investment, and reapply the resale formula in the Restrictive Covenants to determine the amount to which the Grants' were entitled. See Hypes Aff. ¶ 26. This would have resulted in the Grants receiving an additional $2,012.67 from the net proceeds of the sale of the Property. Id. ¶ 27. However, HUD rejected the City's proposal, "maintained its finding against the City," and required the City to either return $68,530.00 in

11

HOME funds or settle with the Grants for an amount to be approved by HUD.[4]  Id. ¶ 28.  The City chose the former course and transferred $68,530.00 from the City's general fund to its HOME Investment Trust Fund.  Id. ¶ 29.

On January 11, 2016, the plaintiff filed the instant action against the City, seeking to recover the $26,257.30 retained by the City from the sale of the Property.  In his original complaint, the plaintiff asserted that the City's actions violated the federal regulations codified at 24 C.F.R. § 92.254(a)(5) and his right to due process under the Fourteenth Amendment.  See Compl. ¶¶ 10, 12, Docket No. 1.

On November 4, 2016, the City moved for summary judgment.  The City argued that its HOME resale policy complied with the HOME regulations in existence at the time the plaintiff and Ms. Grant purchased the property.  The City indicated, however, that it remained willing to pay the plaintiff an additional $2,012.67.  See Br. in Supp. of Mot. for Summ. J. 9, Docket No. 16; see also Hypes Aff. ¶ 30.  The City did not specifically address the plaintiff's due process claim.

On December 5, 2016, the parties appeared before the court for a hearing on the City's motion for summary judgment.  During the hearing, the court raised the issue of whether the plaintiff has a private right of action under the statutory and regulatory provisions at issue.  The court also inquired as to whether the parties would be interested in participating in mediation. The parties agreed to mediate their dispute and the matter was referred to a United States Magistrate Judge for the conduct of mediation proceedings.  During the mediation proceedings, the City agreed to settle the matter for an amount that was higher than it had initially offered to pay the plaintiff.  However, the plaintiff ultimately refused to sign the proposed settlement agreement.

---

[4] According to the City's evidence, HUD determined that $68,530.00 in federal HOME funds had been invested in the Property.  See Hypes Aff. ¶ 29.

On February 24, 2017, the court entered an order directing the parties to file supplemental briefs on the issue of whether the plaintiff has a private right of action under the HOME provisions in question. Both sides submitted supplemental pleadings on that issue,[5] and the court heard additional oral argument on May 19, 2017. The matter is now ripe for review.

## Standard of Review

Rule 56 of the Federal Rules of Civil Procedure permits a party to move for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether to grant a summary judgment motion, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## Discussion

### I.    Statutory and regulatory claims

The plaintiff claims that the resale formula set forth in the Restrictive Covenants is "illegal" under 24 C.F.R. § 92.254(a)(5), and that he should be awarded all of the sales proceeds retained by the City. See Compl. ¶ 8 ("This action of seizure or recapture by the City . . . is illegal under 24 CFR [§] 92.254(a)(5)."); id. ¶ 13 (seeking "damages of $26,257.30").

As discussed above, the regulation at issue is part of a series of regulations implementing the HOME Act. It is undisputed that the HOME Act does not expressly provide a private right of action for damages for alleged violations of the statutory and regulatory provisions governing the distribution and use of HOME funds. Grant argues, however, that a private right of action for

---

[5] Grant moved to supplement his complaint, and the City filed a supplemental motion for summary judgment. Grant's motions will be granted.

damages can be implied from the HOME Act, and, alternatively, that he may pursue a claim for damages under 42 U.S.C. § 1983.   The court will address these arguments in turn.

### A.     Implied right of action under the HOME Act

"[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." Cannon v. Univ. of Chi., 441 U.S. 677, 688 (1979).   Private rights of action to enforce federal laws, whether explicit or implicit, must be created by Congress.   See Alexander v. Sandoval, 532 U.S. 275, 286 (2001). When legislation is enacted pursuant to Congress' spending power, the "typical remedy for . . . noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State [or municipality]." Gonzaga Univ. v. Doe, 536 U.S. 273, 280 (2002) (quoting Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 28 (1981)).   If Congress chooses to confer individual rights subject to private enforcement, the statute must "speak[] with a clear voice, and manifest[] an unambiguous intent to confer individual rights." Gonzaga Univ. v. Doe, 536 U.S. 273, 280 (2002) (citation and internal quotation marks omitted).

Thus, "[t]he question whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction." Transamerica Mortg. Advisors v. Lewis, 444 U.S. 11, 15 (1979).   The "central inquiry" is whether Congress intended to create a private cause of action.   Touche Ross & Co. v. Redington, 442 U.S. 560, 575 (1979).   "'[U]nless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.'" Thompson v. Thompson, 484 U.S. 174, 179 (1988) (quoting Nw. Airlines, Inc. v. Transp. Workers Union, 451 U.S. 77, 94 (1981)); see also Stoneridge Inv. Partners, LLC v.

14

Scientific-Atlanta, Inc., 552 U.S. 148, 164 (2008) (observing that "it is settled that there is an implied cause of action only if the underlying statute can be interpreted to disclose the intent to create one") (citations omitted).

In Gonzaga, the Supreme Court discussed the test for determining whether a statute provides an implied right of action. See 536 U.S. at 290. The Court emphasized that "for Congress to create new rights enforceable under an implied right of action," it must do so in "clear and unambiguous terms."[6] Id. The Court explained that "'the question whether Congress . . . intended to create a private right of action [is] definitively answered in the negative' where a 'statute by its terms grants no private rights to any identifiable class.'" Id. at 283-84 (quoting Touche Ross & Co., 442 U.S. at 576) (omission and alteration in original). "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefited.'" Id. at 284 (quoting Cannon, 441 U.S. at 692 n.13). The Court noted that it had "recognized, for example, that Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments Act of 1972 create individual rights because those statutes are phrased 'with an unmistakable focus on the benefited class.'"[7] Id. (quoting Cannon, 441 U.S. at 691) (emphasis in original). Conversely, the Court has observed that "[s]tatutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of

---

[6] Although the precise issue in Gonzaga was whether a statute created rights enforceable in an action under 42 U.S.C. § 1983, the Supreme Court noted that "[a] court's role in discerning whether personal rights exist in the § 1983 context should . . . not differ from its role in discerning whether personal rights exist in the implied right of action context." 536 U.S. at 285. "Both inquiries simply require a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries." Id. (citations omitted).

[7] Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

persons.'" Alexander, 532 U.S. at 289 (quoting California v. Sierra Club, 451 U.S. 287, 294 (1981)).

Applying these principles, the Gonzaga Court held that the statutory provisions under consideration failed to confer enforceable rights. The plaintiff in Gonzaga attempted to bring a civil action to enforce provisions of the Family Educational Rights and Privacy Act of 1974 ("FERPA"), which was enacted pursuant to Congress' spending power. See Gonzaga, 536 U.S. at 276. FERPA provides, in pertinent part, that "[n]o funds shall be made available . . . to any educational agency or institution which has a policy or practice of permitting the release of educational records . . . of students without the written consent of their parents." 20 U.S.C. § 1232g(b)(1). Under § 1234c(a) of Title 20, the Secretary of Education may terminate funding only if the educational agency or institution fails to "comply substantially" with FERPA's requirements. See 20 U.S.C. § 1234c(a).

In holding that the FERPA's nondisclosure provisions do not create enforceable rights, the Supreme Court first determined that FERPA's nondisclosure provisions "lack the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights." Gonzaga, 536 U.S. at 287 (citing Alexander, 532 U.S. at 288-89). The Court contrasted the wording of the nondisclosure provisions with the individually focused terminology of Title VI and Title IX. See id. The Court emphasized that unlike those statutes, the FERPA provisions at issue "speak only to the Secretary of Education, directing that 'no funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice.'" Id. (quoting 20 U.S.C. § 1232g(b)(1)).

The Supreme Court further determined that the nondisclosure provisions have an "'aggregate' focus . . . [and] are not concerned with 'whether the needs of any particular person

16

have been satisfied.'"  Id. at 288 (quoting Blessing v. Freestone, 520 U.S. 329, 343-44 (1997)). The Court explained that the nondisclosure provisions "speak only in terms of institutional policy and practice, not individual instances of disclosure." Id.  The Court also found significant the fact that "[r]ecipient institutions can further avoid termination of funding so long as they 'comply substantially' with the Act's requirements." Id. (quoting 20 U.S.C. § 1234c(a)). The Court observed that its finding on this issue was "not unlike Blessing, which found that Title IV-D [of the Social Security Act] failed to support a § 1983 suit in part because it only required 'substantial compliance' with federal regulations." Id. (quoting Blessing, 520 U.S. at 335, 343).

Finally, the Gonzaga Court noted that its "conclusion that FERPA's nondisclosure provisions fail to confer enforceable rights is buttressed by the mechanism that Congress chose to provide for enforcing those provisions." Id. at 289.  Specifically, "Congress expressly authorized the Secretary of Education to 'deal with violations' of the Act, [20 U.S.C.] § 1232g(f), and required the Secretary to 'establish or designate [a] review board' for investing and adjudicating such violations, § 1232g(g)." Id. (emphasis and alteration in original). Additionally, the statute's implementing regulations "permit[] students and parents who suspect a violation of the Act to file individual written complaints," and set forth the procedures by which such complaints will be investigated.  See id. (citation omitted).  The Supreme Court determined that such procedures "further counsel against . . . finding a congressional intent to create individually enforceable rights." Id. at 290.

Thus, Gonzaga makes clear that the court must examine the text and structure of a statute in order to determine whether it clearly and unambiguously creates a private right of action.  If the statute's text and structure "provide no indication that Congress intends to create new individual rights, there is no basis for a private suit." Id. at 286.  Likewise, "[i]f they provide some

17

indication that Congress may have intended to create individual rights, and some indication it may not have, that means Congress has not spoken with the requisite 'clear voice,'" and such "[a]mbiguity precludes enforceable rights." 31 Foster Children v. Bush, 329 F.3d 1255, 1270 (11th Cir. 2003) (citing Gonzaga, 536 U.S. at 280).

In this case, the plaintiff's claim for damages appears to be based on Section 215 of the HOME Act, which sets forth the requirements that housing for rental and homeownership must meet in order to qualify as "affordable housing" for purposes of the Act. See 42 U.S.C. § 12745. Of particular importance here, Section 215(b) provides that homeownership housing must be subject to either resale or recapture provisions, and that resale provisions must allow for subsequent purchase at a price that will "provide the owner with a fair return on investment, including any improvements," and "ensure that the housing will remain affordable to a reasonable range of low-income homebuyers." See id. § 12745(b)(3)(A).

No federal court of appeals has expressly decided whether any provisions of the HOME Act confer on individuals a private right of action to enforce those provisions. At least two district courts have summarily concluded that there is no private right of action under the HOME Act. See Bartlinski v. Township of Bricktown, No. 16-8928-BRM-LHG, 2016 U.S. Dist. LEXIS 171800, at *5, 2016 WL 7217613, at *2 (D.N.J. Dec. 13, 2016) (holding that the statutory provisions "do[] not create a private right of action for the misuse of HOME funds") (citing Oti Kaga, Inc. v. S.D. Hous. Dev. Auth., 188 F. Supp. 2d 1148, 1166 (D.S.D. 2002), aff'd, 342 F.3d 871, 884 (8th Cir. 2003)); Pinkney v. City of Jersey City Dep't of Hous. & Econ. Dev., No. 00-cv-01049, slip op. at 3 (D.N.J. June 30, 2000) (holding that the HOME Act "does not provide a civil cause of action for a private litigant to proceed in federal court"). Another district court has

"decline[d] to <u>sua sponte</u>" imply a private right of action for "discrimination in the use of HOME funds." <u>See</u> <u>Oti Kaga</u>, 188 F. Supp. 2d at 1166.

For many of the same reasons discussed in <u>Gonzaga</u>, this court concludes that the applicable provisions of the HOME Act do not create a private right of action for money damages. Like the provisions at issue in <u>Gonzaga</u>, the HOME Act does not contain the individually focused, rights-creating language necessary to establish the requisite congressional intent to create new rights. <u>See</u> <u>Gonzaga</u>, 536 U.S. at 287. Although "the owner" of a residence rehabilitated through the use of HOME funds is one of the beneficiaries of the resale provisions described in Section 215 of the Act, the language at issue is directed toward the participating jurisdictions and the Secretary of HUD, rather than the individuals benefitted by the statute. <u>See</u> 42 U.S.C. § 12745(b)(3) (stating that resale restrictions must be "established by the participating jurisdiction and determined by the Secretary to be appropriate"). In other words, the references to individual owners are made in the context of describing what the resale policies established by participating jurisdictions and approved by the Secretary are supposed to ensure. "[S]uch provisions 'cannot make out the requisite congressional intent to confer individual rights[.]'" <u>31 Foster Children</u>, 329 F.3d at 1272 (quoting <u>Gonzaga</u>, 536 U.S. at 289) (holding that provisions of the Adoption Act describing what a case review procedure is supposed to ensure do not confer individual rights despite the provisions' references to individual children and their placements).

Moreover, the statutory provision as a whole is instructional in nature, in that it delineates the requirements that must be met in order for housing to "qualify as 'affordable housing'" under the HOME Act. <u>See</u> 42 U.S.C. § 12745. Thus, when considered in conjunction with Section 212, the statute serves as a "directive" for the "distribution of public funds," <u>Alexander</u>, 532 U.S. at 289 (citation and internal quotation marks omitted), which must be used for certain "affordable

19

housing" activities, see 42 U.S.C. § 12742(a).  As indicated above, "[s]tatutes that focus on the person regulated rather than the individuals protected" do not tend to create individually enforceable rights.  Gonzaga, 536 U.S. at 287 (quoting Alexander, 532 U.S. at 289); see also Midwest Foster Care & Adoption Ass'n v. Kincade, 712 F.3d 1190, 1200 (8th Cir. 2013) (explaining that "[w]here the statutory language primarily concerns itself with commanding how states are to function within a federal program, the statute is less likely to have created an individually enforceable right"); Hughlett v. Romer-Sensky, 497 F.3d 557, 563 (6th Cir. 2006) (holding that the district court properly found that a statutory provision describing the methods that must be in place for the collection and distribution of collected child support payments was "intended to provide instruction to the States and d[id] not contain the rights-creating language necessary to create an enforceable individual right").

In addition, the enforcement scheme of the HOME Act militates against the conferral of individually enforceable rights.  Rather than requiring perfect compliance with the Act, participating jurisdictions can avoid the termination of federal funding as long as they "comply substantially" with the Act's provisions.  See 42 U.S.C. § 12753 (listing the penalties that may be imposed "[i]f the Secretary finds after reasonable notice and opportunity for hearing that a participating jurisdiction has failed to comply substantially with any provision of this part").  The fact that a statute links funding to substantial compliance with its conditions, while not dispositive of the issue, also suggests that the statute has an aggregate, rather than individual, focus.  See Gonzaga, 536 U.S. at 288 (concluding that the provision of FERPA that allows recipient institutions to avoid termination of funding as long as they "comply substantially" with the statutory requirements indicates an aggregate focus); see also Midwest Foster Care, 712 F.3d at 1200-01 (explaining that "[a] substantial compliance regime cuts against an individually

enforceable right because, even where a state substantially complies with its federal responsibilities, a sizeable minority of its beneficiaries may nonetheless fail to receive the full panoply of offered benefits").

Finally, the court notes that the centralized enforcement scheme created by Congress, while perhaps not as comprehensive as that provided under FERPA, nonetheless epitomizes the remedies found in legislation enacted pursuant to the Spending Clause. As indicated above, the "typical remedy" for noncompliance with federally-imposed funding conditions is "not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the state [or municipality]." Pennhurst, 451 U.S. at 28. In Gonzaga, the Supreme Court made clear that "unless Congress 'speaks with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights, federal funding provisions provide no basis for private enforcement." 536 U.S. at 280.

Since Pennhurst was decided, the Supreme Court has only twice found that statutes passed pursuant to the Spending Clause gave rise to enforceable rights, and one of those cases was against the City's public housing authority. See Gonzaga, 536 U.S. at 280-81. In Wright v. Roanoke Redevelopment & Housing Authority, 479 U.S. 418 (1987), the Supreme Court held that a rent-ceiling provision of the Housing Act created a federal right enforceable under 42 U.S.C. § 1983, since the provision unambiguously conferred a mandatory benefit that was focused on the individual family and its income. 479 U.S. at 430. The statute expressly provided that "tenants could be charged as rent no more and no less than 30 percent of their income." Id. In Gonzaga, the Supreme Court explained that "[t]he key to [the Wright Court's] inquiry was that Congress spoke in terms that 'could not be clearer,' and conferred entitlements 'sufficiently specific and definite to qualify as enforceable rights under Pennhurst.'" 536 U.S. at 280. Likewise, in Wilder

21

v. Virginia Hospital Ass'n, 496 U.S. 498 (1990), which involved a reimbursement provision of the Medicaid Act, the Supreme Court concluded that "Congress left no doubt of its intent for private enforcement, . . . because the provision required States to pay an 'objective' monetary entitlement to individual health care providers," with no sufficient administrative means of enforcement. Gonzaga, 536 U.S. at 280 (citing Wilder, 496 U.S. at 522-23).

Upon review of the text and structure of the HOME Act, the court is convinced that the same cannot be said in the instant case.    Contrary to the statutes at issue in Wright and Wilder, the HOME Act does not "explicitly confer[] specific monetary entitlements upon the plaintiff[]," or otherwise evince Congress' unambiguous intent for the Act's provisions to be privately enforced. Id.    Instead, much like the provisions in Gonzaga, the applicable provisions of the HOME Act lack the necessary rights-creating language, have an aggregate rather than individual focus, and serve primarily to direct the distribution of HOME funds by the Secretary and the use of those funds by participating jurisdictions.    Therefore, the court concludes that the plaintiff does not have an implied private right of action for monetary damages under the HOME Act.

### B.    Enforcement under Section 1983

The plaintiff also contends that even if he lacks a right of action under the HOME Act itself, 42 U.S.C. § 1983 provides him with a vehicle to enforce the provisions of the HOME Act and the related federal regulations.    Section 1983 imposes liability on anyone who, acting under color of state law, deprives a person of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States.    42 U.S.C. § 1983.    "In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal right, not merely a violation of federal law."    Blessing, 520 U.S. at 340 (emphasis in original).    "If there is no violation of a federal right, there is no basis for a claim under § 1983."    Kalan v. Health Ctr. Comm'n of Orange

Cnty., 198 F. Supp. 3d 636, 641 (W.D. Va. 2016) (Conrad, C.J.) (citing Clark v. Link, 855 F.2d 156, 161 (4th Cir. 1988)).

In Gonzaga, the Supreme Court made clear that determining whether a statute confers individual rights enforceable under § 1983 "is no different from the initial inquiry in an implied right of action case." 536 U.S. at 285. In light of the court's conclusion that the provisions of the HOME Act do not confer individual rights enforceable by the plaintiff, it necessarily follows that the plaintiff cannot enforce those provisions under § 1983. See Clear Sky Car Wash LLC v. City of Chesapeake, 743 F.3d 438, 444 (4th Cir. 2014) ("Because we conclude that 42 U.S.C. §§ 4651 and 4655 do not confer individual rights enforceable by Clear Sky, we also conclude that Clear Sky cannot enforce those sections under 42 U.S.C. § 1983.").

The same is true for the federal regulations promulgated pursuant to the HOME Act. It is well settled that a federal regulation, standing alone, "cannot create an enforceable § 1983 interest not already implicit in the enforcing statute." Smith v. Kirk, 821 F.2d 980, 984 (4th Cir. 1987); see also Alexander, 532 U.S. at 291 ("Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not."); Save Our Valley v. Sound Transit, 335 F.3d 932, 943 (9th Cir. 2003) ("Plaintiffs suing under § 1983 must demonstrate that a statute—not a regulation—confers an individual right.") (emphasis in original). Given the court's conclusion that the provisions of the HOME Act do not confer individual rights enforceable by the plaintiff, he cannot maintain a § 1983 action to enforce the HUD regulations promulgated pursuant to the Act. See Johnson v. City of Detroit, 446 F.3d 614, 629 (6th Cir. 2006) ("[I]n the instant case, because we conclude that the relevant provisions of the [federal statutes at issue] do not confer personal federal rights upon plaintiff that are

enforceable under § 1983, the federal regulations promulgated pursuant to these statutes are likewise incapable of independently conferring such rights.").

For these reasons, the court concludes that the plaintiff has no viable claim for damages under the HOME Act itself or § 1983, for alleged violations of the Act and its implementing regulations.   Accordingly, to the extent the City seeks summary judgment on such claims, the motion for summary judgment will be granted.

## II.    Due process claim

Although the HOME Act does not provide the plaintiff with a federal cause of action, the plaintiff's complaint is not limited to claims based on the statute.   Instead, the plaintiff also claims that he was denied due process as required by the Fourteenth Amendment.   See Compl. ¶ 12.

The Fourteenth Amendment to the United States Constitution protects citizens from being deprived of "property" without "due process."   U.S. Const. amend. XIV, § 1.   To establish a violation of procedural due process, the plaintiff "must show that (1) [he] had property or a property interest (2) of which the defendant deprived [him] (3) without due process of law." Sunrise Corp. v. City of Myrtle Beach, 420 F.3d 322, 328 (4th Cir. 2005) (citing Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 826 (4th Cir. 1995)).   Although the exact procedures required by the Constitution depend on the circumstances of a given case, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).

The City did not address the due process claim in the briefs filed in support of its motion for summary judgment.   When questioned by the court at the recent hearing, the City appeared to acknowledge that the plaintiff's allegations may implicate a protected property interest.   See, e.g.,

24

Pater v. City of Casper, 646 F.3d 1290, 1294 (10th Cir. 2011) ("Constitutionally protected property interests are created and defined by statute, ordinance, contract, implied contract and rules and understandings developed by state officials. Thus, for example, courts have identified property interests arising from . . . restrictive covenants between government agencies and private parties. And, of course, ownership of land or real estate is a quintessential source of property interests.") (citations and internal quotation marks omitted). The City argued, however, that the plaintiff received adequate process.

The problem with the City's argument is that it is just that—argument. There is very little evidence in the record regarding the substance and extent of the City's communications with the plaintiff regarding the sale of the Property, the Restrictive Covenants, or the formula set forth therein for dividing the proceeds from the sale. For instance, the Restrictive Covenants state that the sale of the Property "shall allow the owner a fair return on investment," and that "[b]y this is meant that the owner . . . may recover the amount of . . . any capital improvement investment." Restrictive Covenants 1 (emphasis added). Although the affidavit submitted with the City's original motion summarily states that the plaintiff "did not make any eligible capital improvements to the Property," Hypes Aff. ¶ 33 (emphasis added), there is no indication that the plaintiff and Ms. Grant were advised of what improvements would be considered eligible for purposes of determining a fair return on their investment. Nor is there any evidence establishing that the City provided the plaintiff an adequate opportunity to be heard on that issue.

In any event, because the City did not address the due process claim in its motions for summary judgment, the plaintiff was not on notice that he was required to produce evidence to support the claim. Accordingly, the court declines to consider the claim sua sponte or to otherwise address the arguments made by the City for the first time during oral argument. See

Fed. R. Civ. P. 56(f) (providing that the court may grant a motion for summary judgment on grounds not raised by a party only "[a]fter giving notice and a reasonable time to respond"); see also Jehovah v. Clarke, 798 F.3d 169, 177 (4th Cir. Va. 2015) (holding that the district court improperly granted summary judgment to the defendant on a ground that was not raised or addressed in the parties' summary judgment briefing). The court will permit the City to file a supplemental motion for summary judgment raising these and any other arguments it wishes to make regarding the viability of the plaintiff's due process claim. Such motion must be filed within twenty-one days of the date of entry of this memorandum opinion and the accompanying order. The plaintiff will have twenty-one days thereafter in which to file a response.

## Conclusion

For the reasons stated, the pending motions for summary judgment filed by the City are granted in part and denied in part. The Clerk is directed to send copies of this memorandum opinion and the accompanying order to the plaintiff and all counsel of record.

DATED: This ___18th___ day of July, 2017.

_____
United States District Judge