CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 19 2019

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| MARK T. GRANT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 7:16-CV-00007 |
| v. ) | |
| ) | |
| ) | By: Hon. Michael F. Urbanski |
| CITY OF ROANOKE, ) | Chief United States District Judge |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiff Mark T. Grant, proceeding pro se, filed this action under 42 U.S.C. § 1983 against the City of Roanoke (the "City"), alleging that the City improperly retained $26,257.30 from the sale of certain real property. The property at issue was previously rehabilitated for occupancy using funds awarded to the City through the federal HOME Investment Partnerships Program. Grant claimed that the City violated regulations implementing the HOME Investment Partnerships Act ("HOME Act") and his right to due process.

The case was initially assigned to Senior United States District Judge Glen E. Conrad. On July 18, 2017, Judge Conrad ruled that Grant had no viable claim for damages under the HOME Act itself or § 1983 for alleged violations of the Act and its implementing regulations. Accordingly, Judge Conrad granted the City's motion for summary judgment with respect to those claims. The City then filed a supplemental motion for summary judgment on the plaintiff's claim that he was denied due process. On November 7, 2017, that motion was granted in part and denied in part. Finding issues of fact as to whether Grant received adequate notice and an opportunity to be heard, Judge Conrad denied the City's motion for summary

judgment on the issue of procedural due process. However, to the extent that the complaint could be read to assert a violation of substantive due process, Judge Conrad concluded that the City was entitled to summary judgment on such claim.

Following an unsuccessful attempt at mediation, the case was transferred to the undersigned for the conduct of all further proceedings. On December 17, 2018, the parties appeared before the court for a bench trial on the procedural due process claim. Having considered all of the evidence together with the applicable law, the court issues this memorandum opinion, which sets forth its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons stated herein, the court will enter judgment in favor of the City on the remaining claim.

**FINDINGS OF FACT**

1. The City participates in the HOME Investment Partnerships Program ("HOME Program"), a federal grant program that provides funding to states and localities to be used to increase the supply of affordable housing available for low and moderate income residents. The HOME Program is administered at the federal level by the Department of Housing and Urban Development ("HUD").

2. In 2002, the City partnered with Blue Ridge Housing Development Corporation ("BRHDC") to develop and rehabilitate housing for sale to purchasers meeting HUD's income criteria. Pursuant to the partnership agreement, the City gave BRHDC approximately $101,119.05 in HOME funds to acquire and develop property located in the City at 607 Bullitt Avenue ("the Property").

3.      In late 2004 or early 2005, the plaintiff and his wife, Lori M. Grant, began looking for a house to buy in Roanoke. They planned to move to the area from New York after the plaintiff completed his service in the United States Army. While driving around Roanoke with a real estate agent, the Grants saw a "for sale" sign in front of the Property, which was new and in their price range. After touring the Property with their agent, the Grants expressed an interest in purchasing it.

4.      The Grants met with representatives of BRHDC and were found to satisfy the eligibility requirements of the HOME Program. On May 20, 2005, the Grants bought the Property from BRHDC for $85,000.00. The funds used to pay the purchase price and additional closing costs were derived from the following sources: (1) an $80,000.00 mortgage loan; (2) a $2,200 HOME grant from the Virginia Department of Housing and Community Development; (3) a community development block grant ("CDBG grant") in the amount of $6,400.00; and (4) $100.00 in cash, paid out-of-pocket by the buyers.

5.      The Property was subject to certain use and resale restrictions for a period of 15 years, based on the amount of HOME funds used to develop the Property. The restrictions were imposed by a Declaration of Restrictive Covenants ("Restrictive Covenants") that was signed by the City, BRHDC, and the Grants. The Grants executed the Restrictive Covenants in the presence of a notary public on May 20, 2005. The Restrictive Covenants were recorded in the Roanoke City Circuit Court Clerk's Office that same day.

6.      The Restrictive Covenants provided that "[t]he terms and conditions herein shall apply for a period of 15 years from the date this document is recorded ('the period of affordability')." Restrictive Covenants 1, ECF No. 16-1. In accordance with regulations

promulgated by HUD, the Restrictive Covenants specified that the Property could only be conveyed to "a family having a gross family income not exceeding 80% of the area median," and that the family "shall use the Property as its principal residence." Id.; see also 24 C.F.R. § 92.254(a)(3) ("The housing must be acquired by a homebuyer whose family qualifies as a low-income family, and the housing must be the principal residence of the family throughout the [affordability period].").

7. The Restrictive Covenants also provided that the City "shall be notified of any . . . impending resale" within the period of affordability. Restrictive Covenants 1. The Restrictive Covenants further provided, in relevant part, as follows:

> Any such sale or conveyance of the Property shall allow the owner a fair return on investment. By this is meant that the owner, after satisfying any outstanding loans on the Property (including loans made with HOME funds), may recover the amount of the owner's down payment and closing costs and any capital improvement investment. Thereafter, the City and the homeowner shall share any remaining (net) proceeds from the sale or conveyance. The remaining proceeds shall be divided proportionally as set forth in the following mathematical formulas:
>
> $$\frac{\text{HOME investment}}{\text{HOME investment} + \text{homeowner investment}} \times \text{Net proceeds} = \text{Amount to City}$$
>
> $$\frac{\text{homeowner investment}}{\text{HOME investment} + \text{homeowner investment}} \times \text{Net proceeds} = \text{Amount to homeowner}$$

Id.

8. City officials were not present for the closing on the sale of the Property. The plaintiff had no discussions with City officials regarding the Property or the Restrictive Covenants at that time.

4

9. The Grants moved into the Property in May of 2006, after the plaintiff completed his military service. They continued to use the Property as their principal residence until 2010, when they purchased a home in Hardy, Virginia. That same year, the Grants moved to Hardy. They subsequently rented the Property to at least two individuals. The amount of rent charged by the Grants was higher than their monthly mortgage payment on the Property.

10. At some point in 2013, the Grants decided to sell the Property. The plaintiff met with a listing agent, who advised him that the Property was still subject to the Restrictive Covenants.

11. The plaintiff obtained a copy of the Restrictive Covenants and then contacted several attorneys. The attorneys indicated that it would be difficult to avoid the terms of the Restrictive Covenants. After researching the matter on his own, the plaintiff came to believe that certain provisions of the Restrictive Covenants were invalid.

12. In late 2013, the plaintiff went to the City's Department of Planning, Building & Development to speak with someone about the Restrictive Covenants. He eventually met with Crystal Hypes, who held the position of HUD Community Resources Program Specialist II. Hypes was responsible for administering the grant funds obtained through the HOME Program.

13. During his meeting with Hypes, the plaintiff indicated that he and his wife had listed the Property for sale and that a prospective buyer, Devin Brown, had made an offer to purchase the Property. The plaintiff also indicated that he and his family were no longer living there. The plaintiff presented Hypes with a copy of the Restrictive Covenants and inquired as to how the provisions would affect the potential sale. Hypes advised the plaintiff that the

Property was still subject to the terms of the Restrictive Covenants since the 15-year affordability period had not expired, and that the proceeds from any sale within that period would be shared in accordance with the formulas set forth in the Restrictive Covenants.

14. The plaintiff and Hypes discussed the fact that the resale provisions allowed for owners of the Property to recover "any capital improvement investment." The plaintiff told Hypes that he had installed interior cabinets and was planning to build a shed on the Property. Hypes advised the plaintiff that such additions would not qualify as capital improvements for purposes of the Restrictive Covenants. Consequently, the plaintiff did not provide the City with receipts for the cabinets or other improvements made to the Property.

15. The plaintiff also learned that the City did not consider mortgage payments to be part of the "homeowner investment" for purposes of the resale formulas. As a result, the Grants would not recover any equity accumulated from making such payments if they sold the Property prior to the expiration of the 15-year affordability period.

16. Hypes emphasized to the plaintiff that the resale restrictions only applied for a period of 15 years. Hypes recommended that the Grants move back into the Property and wait until the affordability period expired before selling it, so that they would not have to share the sales proceeds with the City.

17. The plaintiff also met with Keith Holland, the Community Resources Program Administrator and Hypes' supervisor. The plaintiff disputed what Hypes had told him about the disbursement of the sales proceeds under the Restrictive Covenants. He and Holland reviewed the terms of the Restrictive Covenants and went over how the sale proceeds would be divided using the resale formulas. The plaintiff presented Holland with information from

HUD and suggested that the Restrictive Covenants did not comply with the applicable regulations. Holland advised the plaintiff that he would get back to him after having the opportunity to review the matter. Holland ultimately determined that the resale provisions in the Restrictive Covenants comported with the applicable regulatory requirements. Accordingly, Holland affirmed the representations made by Hypes, and he communicated his decision to the plaintiff.

18.     The plaintiff had no further communications with Hypes, Holland, or any other City official regarding the Property. He did not ask to speak to Holland's supervisor or the City Manager. Instead, the plaintiff contacted HUD, and he was put in communication with Ronnie Legette, the Director of the Richmond Field Office.

19.     Based on his conversations with Hypes and Holland regarding the resale provisions in the Restrictive Covenants, the plaintiff knew that the City would recover nearly all of the net proceeds from the sale of the Property if he and his wife accepted the pending offer. The plaintiff also understood that the City would not be entitled to any of the sale proceeds if he and his wife waited until after the 15-year affordability period expired to sell the Property. However, by that point, the Grants had already moved to Hardy with their two children, and they did not want to be required to use the Property as their principal residence. The Grants briefly considered what the plaintiff referred to as a "nuclear" option, under which they would lower the price of the Property to the point that there were no remaining sales proceeds to share with the City. The Grants ultimately declined to pursue that option, however, since they believed that it would unfairly advantage the potential buyer. Instead, they decided to accept the pending offer and proceed with sale of the Property.

20. In January of 2014, the Grants sold the Property to Devin Brown for $106,000.00. Prior to the closing date, Hypes met with Brown and confirmed that he met the eligibility requirements for participation in the HOME Program. Hypes advised Brown that the terms of the Restrictive Covenants would continue to apply until the 15-year affordability period expired. Hypes also spoke to the closing agent and explained how the sale proceeds would be divided under the Restrictive Covenants.

21. On the day of closing, Grant called Legette and asked if the net proceeds from the sale of the Property could be placed in an escrow account until HUD had the opportunity to review the Restrictive Covenants. Legette advised the plaintiff that he did not have authority to grant such request.

22. The sale was finalized on January 10, 2014. The sale proceeds were first used to satisfy the balance of the Grants' mortgage loan, to pay the closing costs for the sale of the Property, and to reimburse the Grants for the portion of the initial down payment that they personally made, which was believed at the time to be $669.20. The remaining proceeds in the amount of $26,430.95 were divided with the City using the mathematical formulas in the Restrictive Covenants. Application of the formulas resulted in the City receiving over 99% of the remaining sale proceeds, specifically, $26,257.30, and the Grants receiving an additional $173.65.

23. The Grants initiated a complaint with HUD regarding the manner in which the proceeds from the sale of the Property were divided. The Grants asserted that they did not receive a fair return on their investment. On July 15, 2014, HUD sent Holland a letter in response to the Grants' complaint. Upon review of the matter, HUD "determined that the

city's resale policy for [the Grants'] purchase and subsequent resale of 607 Bullitt Avenue was not in compliance with the HOME regulations in effect in 2005," since the policy "did not define and provide a fair return of the homeowner's initial investment and any capital improvements." July 15, 2014 Letter 2, ECF No. 19-1. HUD also determined that the City had "improperly recaptured the state's downpayment assistance of $2,200." Id. HUD explained that the $2,200 in HOME funds provided by the state should have been "considered to be a portion of the [Grants'] investment because the corresponding period of affordability had been satisfied." Id. HUD ultimately concluded that the "effect" of the problem was that "the Grant[s] did not receive a fair return on their investment pursuant to a regulatory compliant resale policy" and "were not given consideration for the $2,200 in HOME funds provided by the state of Virginia." Id. 3. HUD directed the City to take several corrective actions, including adopting a revised resale policy and recalculating the Grants' resale transaction.

24. The City objected to some of the corrective actions proposed by HUD, but confirmed that the City would treat the $2,200.00 HOME grant from the state as part of the homeowners' investment and return that amount to the Grants. By letter dated June 9, 2015, HUD maintained its finding against the City and rejected the City's assertion that it had "resolved" the matter "with the return of the $2,200 to the Grants." June 9, 2015 Letter 2, ECF No. 42-5. HUD noted that although the resale price of the Property was significantly above the original purchase price, "the City recaptured equity the Grants earned by making monthly payments on their first mortgage." Id. HUD ultimately required the City to either repay $68,530.00 to its HOME account from non-federal funds or enter into a negotiated

9

settlement with the Grants for an amount to be approved by HUD. The City chose the former course and transferred $68,530.00 from the City's general fund to its HOME account.

25. During the course of the litigation, the City conceded that the $2,200.00 HOME grant from the state should have been credited to the Grants under the resale provisions of the Restrictive Covenants. At trial, Holland confirmed that this error would be corrected. Holland also acknowledged that the Grants should have received credit for the CDBG grant in the amount of $6,400.00, and that the CDBG funds would be placed on the Grants' side of the ledger. With respect to capital improvements, Holland admitted that the Grants were entitled to reimbursement for any capital improvements made to the Property. However, the City never received any receipts or other documentation from the Grants. As for HUD's concern that the City recaptured equity that the Grants earned by making their monthly mortgage payments, Holland testified that the City did not ordinarily consider mortgage payments in applying the resale formulas. To the extent that the Grants are entitled to additional credit for their mortgage payments, Holland suggested that the amount of such additional credit should be offset by the income that the Grants received from renting the Property in violation of the Restrictive Covenants.

26. The plaintiff did not submit any evidence at trial documenting improvements made to the Property. Three days after the bench trial, the plaintiff filed copies of receipts from Home Depot, Lowe's, Comfort Zone, and Woods Family Heating & Air Conditioning.

## CONCLUSIONS OF LAW

The Fourteenth Amendment prohibits states and municipalities from "depriv[ing] any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV. "Due

process contains both substantive and procedural components." Snider Int'l Corp. v. Town of Forest Heights, 739 F.3d 140, 146 (4th Cir. 2014). The sole remaining claim is asserted under the procedural component of the Due Process Clause.

To establish a violation of procedural due process, the plaintiff "must show that (1) [he] had property or a property interest (2) of which the defendant deprived [him] (3) without due process of law." Sunrise Corp. v. City of Myrtle Beach, 420 F.3d 322, 328 (4th Cir. 2005) (citing Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 826 (4th Cir. 1995)). After carefully considering the evidence adduced at trial, the court concludes that the plaintiff has not met his burden of proving by a preponderance of the evidence that he was deprived of a property interest without due process.

"At bottom, procedural due process requires fair notice of impending state action and an opportunity to be heard." Snider Int'l Corp., 739 F.3d at 146. The notice and hearing requirements are "distinct features of due process," and thus governed by different standards. Id. "Notice must be 'reasonably calculated to convey information concerning a deprivation,' while the hearing requirement is flexible, taking into account a 'balancing of the private interest and the public interest, along with the risk of an erroneous deprivation of such interest through the procedures used, and the probable value if any, of additional or substitute procedural safeguards.'" Applegate, LP v. City of Frederick, 179 F. Supp. 3d 522, 529 (D. Md. 2016) (quoting Snider Int'l Corp., 739 F.3d at 146); see also Mathews v. Eldridge, 424 U.S. 319, 335 (1976)). The Supreme Court "consistently has held that some kind of hearing is required at some time before a person is finally deprived of his property interest." Memphis Light, Gas and Water Div. v. Craft, 436 U.S. 1, 16 (1978) (internal quotation marks omitted). However,

11

"the 'hearing' required by the Due Process Clause need not be an adversarial hearing, a full evidentiary hearing, or a formal hearing." D.B. v. Cardall, 826 F.3d 721, 743 (4th Cir. 2016) (internal quotation marks omitted). Instead, "the opportunity for informal consultation with designated personnel empowered to correct a mistaken determination constitutes a 'due process hearing' in appropriate circumstances." Craft, 436 U.S. at 16 n.17 (1978); see also id. ("[A] hearing in its very essence demands that he who is entitled to it shall have the right to support his allegations by argument however brief, and, if need be, by proof, however informal.") (internal quotation marks omitted).

Applying these principles, the court concludes that the evidence fails to establish that the plaintiff was deprived of a property interest without adequate notice or an opportunity to be heard. Turning first to the issue of notice, it is undisputed that the Grants executed the Restrictive Covenants in the presence of a notary public on May 20, 2005. Although the Restrictive Covenants may not be free from all ambiguities, the provisions clearly put the Grants on notice that the proceeds from any subsequent sale of the Property within the 15-year affordability period would be shared with the City. Moreover, prior to reselling the Property, the plaintiff discussed the terms of the Restrictive Covenants with Hypes and Holland, and received confirmation that the resale provisions would apply if he and his wife chose to sell the Property at that time. In reviewing the resale provisions with Hypes and Holland, the plaintiff was advised that expenditures for new cabinets and a storage shed would not qualify as a "capital improvement investment" under the standard employed by the City, and that the City did not consider mortgage payments to be part of the "homeowner investment" for purposes of the resale provisions. Thus, the plaintiff knew from his

discussions with the City employees that he and his wife would not recover any equity under the City's application of the resale formulas, if they proceeded with the proposed sale of the Property. The plaintiff also knew that he and his wife would no longer be required to share any of the sale proceeds with the City if they waited until after the 15-year period expired to sell the Property. Despite having knowledge of the resale provisions, the City's interpretation of those provisions, and the manner in which the resale formulas would be applied, the Grants elected to proceed with the sale of the Property to Brown. Based on the evidence presented, the plaintiff is unable to prove that he was deprived of an interest in the Property without adequate notice.

The court likewise concludes that the evidence fails to establish that the plaintiff did not receive an adequate opportunity to be heard. Prior to selling the Property, the plaintiff personally met with Hypes regarding the Restrictive Covenants and expressed his concerns regarding the resale provisions. The plaintiff also received the opportunity to meet with Holland and voice his objections to the Restrictive Covenants. After reviewing the matter, Holland affirmed the representations made by Hypes. The plaintiff did not ask to speak to Holland's supervisor or the City Manager before selling the Property. See Code of the City of Roanoke Ch. 2, Art. V, § 2-120 ("Except as otherwise specifically provided the city manager shall exercise supervision and control over all city departments and divisions."). Instead, the plaintiff and his wife elected to proceed with the sale, despite knowing that they would only receive a small share of the proceeds. Based on the evidence presented, the plaintiff is unable to prove that he was deprived of an adequate opportunity to be heard under the circumstances of this case.

In arguing to the contrary at trial, the plaintiff repeatedly emphasized that the City was not a "neutral" party to the discussions regarding the Restrictive Covenants and that its application of the resale formulas was later found to be in error by HUD. As indicated above, however, due process does not require a pre-deprivation hearing before a neutral party in every case. See Craft, 436 U.S. at 16, n. 17 (noting that the opportunity for informal consultation with designated personnel satisfies the hearing requirement in appropriate circumstances); see also Garraghty v. Jordan, 830 F.2d 1295, 1302 (4th Cir. 1987) (holding in the public employment context that "[a] pre-deprivation proceeding need not be a full evidentiary hearing with witnesses and a neutral decision maker so long as the employee is given an opportunity to answer the charges"). Nor does the Fourteenth Amendment entitle a complaining party to "perfect" process. See Mackey v. Montrym, 443 U.S. 1, 13 (1979) ("The Due Process Clause simply does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations."). Instead, "'procedural due process is simply a guarantee' that there is notice and an opportunity to be heard." Snider Int'l Corp., 739 F.3d at 149 (quoting Mora v. City of Gaithersburg, 519 F.3d 216, 230 (4th Cir. 2008)). Based on the evidence presented, the court concludes that the pre-deprivation process afforded by the City met these minimal requirements.

Additionally, the plaintiff had post-deprivation procedures available to remedy any perceived error in the application of the Restrictive Covenants. As the United States Court of Appeals for the Fourth Circuit recently explained, "[a]nalyzing the adequacy of process a state affords usually requires courts to 'consult the entire panoply of predeprivation and postdeprivation process provided by the state.'" Rockville Cars, LLC v. City of Rockville, 891

F.3d 141, 149. (4th Cir. 2018) (quoting Tri-Cty. Paving, Inc. v. Ashe Cty., 281 F.3d 430, 436 (4th Cir. 2002)). "This is so because a due process violation 'is not complete' when the deprivation occurs; rather it is only complete when the government 'fails to provide due process.'" Ashley v. NLRB, 255 F. App'x 708, 710 (4th Cir. 2007) (quoting Zinermon v. Burch, 494 U.S. 113, 126 (1990)). In this case, the City agreed to return a portion of the sale proceeds to the Grants after they complained to HUD. If the Grants believed that the proposed adjustment would still not provide a fair return on their investment as required by the Restrictive Covenants, they could have pursued an action for breach of contract in state court. See, e.g., Riordan v. Hale, 212 S.E.2d 65, 67 (Va. 1975) (describing restrictive covenants as "contractual devices" that "must be strictly construed"). The plaintiff has provided no basis upon which the court could conclude that such remedy would have been constitutionally inadequate. See Rockville Cars, LLC, 891 F.3d at 149 (concluding that the plaintiff's failure to pursue available state court remedies was fatal to its procedural due process claim); Martinez v. City of Cleveland, 700 F. App'x 521, 523 (6th Cir. 2017) (finding no due process violation where the plaintiff had "numerous state-law remedies available to him," including "a breach of contract suit").

In sum, the court concludes that the plaintiff has not met his burden of proving by a preponderance of the evidence that he was deprived of a property interest without due process. Accordingly, the court will grant judgment in favor of the City on the procedural due process claim.*

---

* Because the plaintiff failed to establish a procedural due process violation, the court need not further address the City's argument that the evidence was insufficient to support a finding of municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978).

Notwithstanding the court's conclusion that the plaintiff has no viable claim for relief under the Fourteenth Amendment, it is clear from the evidence that errors were made by the City in applying the resale provisions of the Restrictive Covenants. Based on the City's representations at trial, it is the court's understanding that the resale formulas will be recalculated, and that the Grants will receive credit for the $2,200.00 HOME grant from the state and the CDBG grant in the amount of $6,400.00. To the extent that the plaintiff believes that he is also entitled to reimbursement for capital improvements made to the Property, the plaintiff must submit the necessary documentation directly to the City for its review and consideration. Finally, in light of the concern raised by HUD, the City should give appropriate consideration in its revised calculations to crediting the Grants with their equity investment resulting from their mortgage payments, offset by the rental income that the Grants earned in violation of the Restrictive Covenants and the applicable federal regulations.

An appropriate Order will be entered.

Entered: 03-18-2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge